## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 21-CR-60284-RAR

**UNITED STATES OF AMERICA**

**vs.**

**RICARDO LOPEZ,**

**Defendant.**

_____/

FILED BY_____AT_____D.C.

May 18, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

### REPORT AND RECOMMENDATION

THIS CAUSE comes before the Court on Defendant Ricardo Lopez's Motion to Suppress Search of Parcel and Request for *Franks* Hearing ("Defendant's Motion") [DE 77] and the Government's Motion to Dismiss the Defendant's Motion to Suppress ("Government's Motion"). [DE 81].[1] The Defendant's Motion seeks to suppress physical evidence stemming from the search of a mail parcel intercepted by law enforcement ("Castro Parcel") and requests a *Franks* hearing to address alleged misrepresentations in the affidavit in support of the search warrant authorizing that search. I have reviewed the Defendant's Motion, the Government's Motion, and the

---

[1] The Honorable Rodolfo A. Ruiz, II, referred the Defendant's Motion to me "to take all necessary and proper action as required by law." [DE 78]. I construe this referral as encompassing issuing a Report and Recommendation concerning the Government's Motion, which addresses the Defendant's Motion and overlaps with (and was filed the same day as) the Government's Response to the Defendant's Motion. The Government's Motion urges the Court to dismiss the Defendant's Motion, arguing that the Defendant has no reasonable expectation of privacy in the parcel that is the subject of the Defendant's Motion and thus has no "standing" to challenge the search of that parcel. "The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) (internal citations omitted). "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Id.* (instructing that, on remand, the Court of Appeals was not required to address reasonable expectation of privacy before, in its discretion, first addressing whether probable cause for the search existed). For these reasons, it is doubtful that the Government's Motion is proper as a separate motion, as opposed to forming a portion of the Government's response to the Defendant's Motion. At any rate, because I consider whether the Defendant had a reasonable expectation of privacy in the subject parcel, and ultimately conclude that the Defendant's Motion fails on the merits (regardless of whether he has a reasonable expectation of privacy), I recommend that the Government's Motion be **DENIED AS MOOT**.

Government's Response to the Defendant's Motion [DE 82].[2]  On May 8, 2023, I held an evidentiary hearing at which the parties presented testimony, evidence, and arguments on the Defendant's Motion.  Being fully advised in the premises, I respectfully **RECOMMEND** that the Defendant's Motion be **DENIED**.

## I.      FINDINGS OF FACT

Based on the testimony and evidence presented at evidentiary hearing on May 8, 2023, including my observations of the demeanor and credibility of the witnesses presented, I make the following findings of fact.

### A.   Interception of the Castro Parcel

On Thursday, September 9, 2021, Palm Beach County Sheriff's Office Agent (and United States Postal Inspection Service Task Force Officer) Henry Ramos ("Ramos") identified a United States Postal Service (USPS) parcel ("Castro Parcel") addressed to "Auto Body Shop, aka Castro, 149 SE Second St., Bay 1, Deerfield Beach, FL 33441." ("Delivery Address").  The Castro Parcel listed a return address of "Alex Wright, 1556 Oaisis (sic) St., Phelan, CA 92329."  ("Return Address").  Ramos received an alert about the Castro Parcel based on a "mail cover" he had established based on perceived connection (discussed more fully below) between the Delivery Address and a parcel delivered to an address in West Palm Beach in July 2021 that had contained fentanyl (the "Elder Parcel").[3]  After receiving the alert, he obtained an image of the Castro Parcel (which is typically created by the post office from which the parcel is mailed).  Ramos suspected that the Castro Parcel may contain narcotics or narcotics proceeds based his training and experience[4] and on the following observations:

---

[2] The Defendant did not file a response to the Government's Motion; nor did he file a reply to the Government's Response to his motion.

[3] In its Response and during the May 8 hearing, the Government referred to this parcel as the "Romero" parcel.

[4] Agent Ramos has been employed by the Palm Beach County Sheriff's Office (PBSO) for more than 9 years.  In

1. The handwriting on the labels of the Elder Parcel and the Castro Parcel appeared similar. The Castro Parcel was also packed in a "ReadyPost" box, as was the Elder Parcel. Whereas 90% of the packages Ramos has reviewed are sent in white postal boxes, only approximately 10% are in ReadyPost boxes (although both are available for purchase from the post office).

2. The Return Address on the Castro Parcel was not associated with any actual structure. Ramos entered the Return Address into the "C.L.E.A.R." database, which uses open source information to identify who is associated with or has used a particular address (for example, by receiving credit cards or other mailings there). Noting that the Return Address appeared to mis-spell the word "Oasis" in the street name, he ran the address with both the street name as written and using the correct spelling of "Oasis." C.L.E.A.R. found no associations between either version of the Return Address and "Alex Wright," the name of the purported sender in the return address. Indeed, C.L.E.A.R. did not identify any individual at all associated with the Return Address. Ramos then entered both versions of the Return Address into either Google Maps or Apple Maps. The map application did not locate an actual structure associated with the Return Address; rather it simply showed the middle of a street. Further, while the Return Address included the city of Phelan, California, it listed a zip code that is not associated with that city. Ramos noted that parcels sending drugs through the mail frequently use a fictitious address to mask the sender.

---

approximately June 2013, he successfully completed a police academy run by Palm Beach State College (in association with the State of Florida), which lasted for 9 months. He is currently assigned to PBSO's Narcotics Division as an "Agent" (which he described as equivalent to a detective). For approximately two years (i.e. since sometime in 2021), he has been a Task Force Officer (TFO) with the United States Postal Inspection Service. As a TFO, he received training by, in part, "working at the hip" of a Postal Inspector and learning how Postal Service databases work and how to draft search warrants, among other things.

3.  The label indicated that the Castro Parcel was actually mailed from zip code 90744, which is approximately 100 miles from the Return Address listed on the parcel.

4.  Ramos could not identify anyone named "Castro" associated with the Delivery Address. He ran the Delivery Address in C.L.E.A.R. and did not see any person using that name as a first or last name or any business including that name associated with the Delivery Address. He additionally searched wage and hour reports to see if anyone with the name Castro had been employed at the Delivery Address, but he found no such records.

5.  In Ramos's experience, individuals involved in the trafficking of controlled substances often use the USPS (and specifically Priority Mail Express services) to transport controlled substances and proceeds from the sale of controlled substances because of the service's speed and reliability, the sender's ability to track a parcel's status throughout the delivery process, and the inability of USPS (in comparison to private delivery services) to search parcels without a search warrant. Ramos noted that the use of Priority Mail Express (which entails overnight delivery) leaves a short window between the parcel being put into the mail stream and its delivery within which law enforcement can identify and investigate it. In other words, there is little time for law enforcement to investigate the parcel before causing a noticeable delay that could alert the sender or recipient that something is amiss.

6.  The sender of the Castro Parcel paid $128.00 (visible within a red box on the label) to ship it and apparently paid in cash.

7.  The Return Address was in California, which Ramos identified as a "known source state for controlled substances" given its proximity to Mexico.

8.  While the Castro Parcel was sent by Priority Mail Express, it was not associated with a business account number.  Although a business account is not required to send a parcel through Priority Mail Express, using a business account creates a "paper trail" because establishing a business account requires the account holder to submit a copy of a driver's license and register a phone number.  Further, the label on the Castro Parcel was handwritten, whereas parcels sent through business accounts usually use typed labels.

9.  The Castro Parcel was heavily taped.  In Ramos's experience, individuals sending controlled substances through the mail heavily tape parcels in order to mask the odor of those substances from drug-sniffing K9s.

B.  Canine Wall-E

1.  Canine Sniff of the Castro Package

Continuing on September 9, 2021, based on his suspicions, Ramos pulled the Castro parcel from the mail stream, at a U.S. mail facility in West Palm Beach and arranged for a drug detection canine to conduct an "open-air" sniff.  Approximately thirty minutes later, Palm Beach County Sheriff's Office (PBSO) Deputy Cesar Tejada arrived at the facility with his drug-detection-trained canine named "Wall-E."   The Castro Parcel was placed in a row with four or five empty boxes of similar shape and size.  The boxes were placed approximately 5-6 feet apart so that their odors or surfaces did not interfere with one another.  After Deputy Tejada gave Wall-E his standard command to search ("zuk"), Wall-E walked independently on an extended leash and put his nose around the parcels.[5]  Wall-E "alerted" (through a clear change of behavior) as soon as he put his nose on the Castro Parcel.  Wall-E then gave his "final response" by sitting (which is his trained

---

[5] Deputy Tejada credibly testified that this sniff inspection was conducted according to his and Wall-E's training. Deputy Tejada did not walk along with Wall-E, allowing Wall-E to independently conduct his search.

final response).   Based on Wall-E's final response (in addition to the factors described above), Ramos seized the Castro Parcel and sought a search warrant to search its contents.

### 2.  Wall-E's Training and Reliability

Deputy Tejada began training as a drug-detection canine handler in late 2019 into 2020. He has trained and worked with Wall-E continuously since early 2020 (for approximately three years).[6]  Wall-E is a German Shepherd that PBSO obtained through a broker specializing in purchasing and selling dogs to work as drug detection dogs.  Wall-E was approximately 3-4 years old at the time he was purchased.  As part of the purchase process, PBSO confirmed with the broker that the dog has not worked with other law enforcement agencies before.

Deputy Tejada and Wall-E attended the Palm Beach County K9 Academy ("K9 Academy"), which is held by PBSO, in 2020, beginning together as soon as Deputy Tejada got Wall-E.  The K9 Academy's instructors are senior PBSO deputies who are certified as canine trainers.  The K9 Academy training lasted for 6 months, with either two or three dogs (and their handlers) being trained by one trainer.  The program concentrated on training the dogs in obedience and detection.

As part of the K9 Academy, Deputy Tejada and Wall-E went through approximately 420 hours of training.  Trainers constantly monitored both Deputy Tejada and Wall-E to evaluate their bonding and Wall-E's obedience and performance.  Wall-E was trained solely to detect narcotics (as opposed to explosives, currency, human bodies, or other substances), specifically cocaine, heroin, methamphetamine, and MDMA.  The K9 training is "odor-based," meaning the trainers teach the dog to identify the odor of the narcotics and reward the dog when he finds the source of the odor.  Deputy Tejada described the reward system as "paying" the canine by giving him a

---

[6] Deputy Tejada had previously been assigned another canine, but that dog had proven to be too aggressive and was returned in 2019.

Kong chew toy that makes him happy.  The training began with hiding narcotics in a small area, bringing Wall-E to the room, giving him the "zuk" command, allowing him to sniff and explore the area, and rewarding him when he changed behavior by sitting at the source of the odor. Eventually, the training expanded to include placing "scent boxes" containing various different odors in a line and rewarding the canine when he put his nose on the correct odor.

Training also often (although not always) included the use of "distractors" – such as food, currency, clothing, or other things with odors different from narcotics – to teach the canine to alert to the odor of narcotics but not other odors.  For example, Deputy Tejada described a course set up at a postal facility with multiple rooms.  In some of the rooms, there are both distractors and a "hide" (hidden narcotics), while in other rooms there are only distractors but no "hides."  The canine is trained to bypass the distractors and only alert on the "hides," with the correct response in the rooms without a "hide" to be no alert at all.

In order to successfully complete the training, graduate, and obtain certification, Wall-E and Deputy Tejada needed to complete a test designed by the Florida Law Enforcement Certification Administration ("FLECA").  The certification course consists of searches in rooms, vehicles, and open areas.  Part of the certification test is to avoid alerts for distractors (such as in the rooms described above with distractors but no "hides").  Deputy Tejada and Wall-E successfully passed the certification test on their first attempt.

Once initially certified, canines and handlers are required to be re-certified by FLECA annually.  Each re-certification requires the canine and handler to again pass a certification course. The location of these re-certifications varies, with FLECA selecting different locations for each re-certification.   The re-certification process also includes consideration of the canine's

performance and observation to ensure that the canine is doing its job in the appropriate way. Wall-E and Deputy Tejada have been re-certified by FLECA in each of 2021, 2022, and 2023.

In addition to the annual re-certification, Wall-E and Deputy Tejada are required to undergo training at least once a month. However, they typically train at least once a week, and sometimes more often. Deputy Tejada estimated that he and Wall-E attend approximately 80% of the weekly trainings. Approximately 60% of the time, these weekly training sessions implement "distractors" as described above. Wall-E has never failed his certification tests nor his monthly or weekly training sessions.

Deputy Tejada is unaware of any PBSO drug detection canines who have been discontinued due to poor performance, although he is aware that some dogs have been discontinued due to health reasons (such as hip problems or loss of drive). He also insisted that Wall-E has never failed any of his training tests, in the K9 Academy or otherwise. For example, when asked whether Wall-E had run through training scenarios with a sanitized room containing boxes without narcotics (where the goal is for the dog to search and <u>not</u> alert), Deputy Tejada said that Wall-E has gone through such scenarios and has never alerted in those scenarios. In fact, Wall-E has gone through such testing scenarios in the same mail facility where the Castro Parcel was inspected.

When challenged about Wall-E's performance in real-life scenarios, Deputy Tejada also insisted that Wall-E has never "gotten it wrong." Deputy Tejada recalled two instances when Wall-E alerted but a subsequent search did not find any narcotics. One such instance was earlier in 2023 when Wall-E alerted on a box that was subsequently found to only contain a sweater. Deputy Tejada also thought there may have been an occasion in 2022 when Wall-E alerted on a vehicle but no narcotics could be found. He could not recall whether any such instances had occurred in 2021 and his memory did not appear certain as to 2022. For such instances, he would

file an incident report indicating "negative." Deputy Tejada insisted that these alerts were not "wrong," however, because the odor of narcotics can linger on items or surfaces for an indeterminate period of time.[7] Therefore, he concluded that Wall-E was alerting to the odor of narcotics that had previously been in the box or vehicle. Deputy Tejada conceded that there would be no way to independently verify whether narcotics had previously been in those places or not, but he refused to acknowledge the possibility that Wall-E had alerted incorrectly. He also testified that while PBSO had approximately 20-25 canines trained for narcotics detection, he had never heard of instances of canines alerting incorrectly.

Deputy Tejada estimated that Wall-E had conducted over 100 searches since his certification in 2020. These searches have involved searches of parcels, vehicles, rooms, luggage, and freelance sniffs in open areas of the airport. Again, Deputy Tejada could only recall two instances where Wall-E had alerted and no narcotics had been found.[8] He conceded, however, that he did not have a definitive list of such instances or of "negative" incident reports. He did insist that Wall-E does not "alert all the time" and that there are many instances when Wall-E is deployed but does not alert at all. He estimated that Wall-E has alerted in approximately 20% of his deployments and that "the vast majority of the time" when Wall-E alerts, agents later confirm that they subsequently found narcotics.

---

[7] The Government pointed to the search of the Castro Parcel as an example of Deputy Tejada's point. As Deputy Tejada explained, Wall-E was not rewarded after his alert on the Castro Parcel on September 9. Rather, per his usual protocol, Deputy Tejada brought Wall-E back to the postal facility after the execution of the search warrant (described below) confirmed that the Castro Parcel contained methamphetamine. Upon returning to the postal facility, Wall-E repeated the sniff inspection of the now-empty Castro Parcel (along with, again, 4-5 other empty boxes) and again alerted on the Castro Parcel. Only then did Deputy Tejada reward Wall-E for alerting on the Castro Parcel (which, by then, they knew had previously contained narcotics). After the incident in 2023 when Wall-E alerted on a box but only a sweater was found, Deputy Tejada similarly brought Wall-E back to re-do the sniff, post-search. Wall-E again alerted on the empty parcel. However, Deputy Tejada did not reward Wall-E because the search had been "negative."

[8] The Defendant elicited testimony that Wall-E had also alerted on the Elder Parcel, which was found to contain fentanyl, even though Wall-E is not trained in the detection of fentanyl (and, indeed, to Deputy Tejada's knowledge, no dog is). When cross-examined about this fact, Ramos reasoned that someone shipping fentanyl may also be dealing with one of the controlled substances that Wall-E is trained to detect and that odor from those substances may have been on the Elder Parcel.

C. <u>Search Warrant</u>

Inspector Ramos submitted an application for a search warrant to Magistrate Judge Reinhart on Friday, September 10, 2021, which Magistrate Judge Reinhart granted on Monday, September 13, 2021. [DE 77-1]. The affidavit in support of the search warrant included some (but not all) of the above-described information that formed the basis of Ramos's pre-canine-sniff suspicion.[9] It included assertions (based on Ramos's training and experience) that the USPS Priority Mail Express and Priority Mailing Services were developed primarily for business mailings, which usually bear typewritten labels on flat, letter-sized mailers, and that USPS issues corporate charge accounts to enable avoiding cash payments and waiting in lines. *Id*. at ¶ 6. It also included assertions regarding drug dealers' "frequent use" of USPS's priority mail services (for the reasons discussed above) and the packaging methods those drug dealers use. *Id*. at ¶¶ 7-8. The affidavit also described the identification of the Castro Parcel and the observations about its lack of association with a business account, its return address not being associated with a physical structure, and the name "Castro" not being associated with the delivery address. *Id*. at ¶ 13. The affidavit asserted that California (where the return address zip code is located) is a "known source state" for controlled substances being mailed through the United States and that drug traffickers commonly use fictional names and addresses on their packages to avoid detection. *Id*. at ¶¶ 14, 16.

---

[9] The affidavit did not mention any similarity between the handwriting on the mailing labels of the Elder Drive Parcel and the Castro Parcel. However, the affidavit did include photographs of both parcels. [DE 77-1 at 5 and 10]. Having viewed both photographs, I find that the handwriting is somewhat similar. The affidavit did not describe the amount of tape on the Castro Parcel; it only generally mentioned that drug traffickers often use several layers of protective wrap around the package to conceal its contents. *Id*. at ¶ 8. The affidavit did not mention the use of "ReadyPost" boxes or indicate that the shipment was paid in cash (other than noting that it was not paid through a business account, which would typically employ a credit card). It also did not identify the discrepancy between the Return Address's zip code and the zip code from which the Castro Parcel was actually mailed (or the 100-mile distance between them). Nevertheless, I credit Ramos's testimony that these observations contributed to his suspicion about the Castro Parcel, even if they were not included for Magistrate Judge Reinhart to consider in determining probable cause.

The affidavit also described the seizure of the Elder Parcel and attempted to connect the Elder Parcel to the Castro Parcel.  In the affidavit, Ramos asserted that he had initially identified the Elder Parcel "as bearing common characteristics to parcels containing controlled substances," and that "[d]uring my investigation I was able to identify that the sender of [the Elder Parcel] was based out of San Bernardino County, California, which uses the 3-digit ZIP code prefix 923." *Id.* at ¶ 9.  After describing how he obtained a search warrant for the Elder Parcel (leading to the discovery of fentanyl) and how a controlled delivery of the Elder Parcel yielded "investigative leads," Ramos's affidavit described his "follow-up investigation." *Id.* at ¶¶ 10-12.  According to the affidavit, Ramos utilized USPS databases to identify that "at the time [the Elder Parcel] entered the USPS mail-stream, **the same sender** also sent a parcel to 1209 Indiana Street, Martins Ferry, Ohio" ("the Martins Ferry Address") using Priority Mail. *Id.* at ¶ 12 (emphasis added).  He further asserted that

> from January 2021 to July 2021, the residence in Martins Ferry, Ohio had received a total of twelve parcels from ZIP code prefix 923.  These parcels appear suspicious to me because of anomalies in the return addresses and unusual packing boxes.  At the same time that one of these packages was mailed, **the same sender** also sent a parcel to 149 SE 2nd Street, Deerfield Beach, FL, 33441.

*Id.* (emphasis added).  Later on, after asserting that California is a "known source state" for controlled substances, the affidavit noted that the Castro Parcel "contains the 3-digit ZIP code prefix 923, which has been identified as being associated with the primary 3-digit ZIP code for **the same sending organization** based out of San Bernardino County, California." *Id.* at ¶ 15 (emphasis added).

The affidavit also described Wall-E's alert on the Castro package and provided background regarding Wall-E's training.  Specifically, the affidavit stated that

> PBSO Deputy Cesar Tejada and Wall-E have trained and worked as a team for approximately three years.  Wall-E has successfully completed 420 hours of

Narcotics Detection Courses and is certified in the detection of cocaine, heroin, methamphetamine, and ecstasy as well as derivatives. Wall-E is certified on a yearly-basis. Wall-E has been trained to sit down in front of an item when he smells the presence of illegal narcotics to alert his handler of the presence of narcotics.

*Id*. at 19.

After Magistrate Judge Reinhart issued the search warrant on September 13, Ramos executed the search warrant the same day and opened the Castro Parcel. He found approximately 2,131 grams of a substance subsequently confirmed to contain methamphetamine.

D. Tracking Warrant and Anticipatory Search Warrant

On September 15, 2021, Inspector Ramos applied to me for a tracking warrant (to track the movements of the Castro Parcel) and an anticipatory search warrant (for the Delivery Address on the Castro Parcel) as part of a law enforcement plan to conduct a controlled delivery of the Castro Parcel. [DE 77-2]. I issued the applied-for tracking warrant and anticipatory search warrant, which authorized law enforcement to insert a tracking device and beeper alarm into the Castro Parcel. The beeper alarm was designed to activate and notify law enforcement when the Castro Parcel was opened.

While the affidavit in support of the tracking warrant and anticipatory search warrant were largely similar to the affidavit in support of the search warrant presented to Magistrate Judge Reinhart, the description of the connections between the Elder Parcel, the Martins Ferry Address, and the Castro Parcel was somewhat different. In the affidavit presented to me, Ramos stated that

> **the same return address** annotated on [the Elder Parcel] was also **the same return address** on a parcel sent to a residence in Martins Ferry, Ohio. Further investigation revealed that from January 2021 to July 2021, the residence in Martins Ferry, Ohio had received a total of twelve parcels from ZIP code prefix 923. These parcels appeared suspicious because of anomalies in the return addresses and unusual packing boxes. Moreover, I discovered the [] return address set forth in one of the Ohio parcels was the **same return address** as a parcel sent to [the Castro Parcel's delivery address].

*Id*. at ¶ 7.  In other words, whereas the affidavit presented to Magistrate Judge Reinhart used the phrase "the same sender" to describe the connection between the Elder Parcel and one of the parcels sent to the Martins Ferry Address, as well as the connection between one of the parcels sent to the Martins Ferry Address and the Castro Parcel's Delivery Address, the affidavit presented to me instead used the phrase "the same return address."  Moreover, the affidavit presented to me made it somewhat more clear that the "same return address" shared by the Elder Parcel and one of the parcels sent to Martins Ferry was not necessarily the "same return address" shared by a different parcel sent to Martins Ferry and the other parcel sent to the Castro Parcel's Delivery Address.

At the May 8 hearing, Ramos testified that when he began investigating the Elder Parcel, he ran a "batch report" or "transaction report" which can show parcels sent from a particular post office, showing the parcels' tracking numbers, the time at which they were scanned at the post office counter, and payment information.  Based on the batch report, he determined that the Elder Parcel and a parcel sent to the Martins Ferry Address were sent by the same sender, because their tracking numbers were scanned at the same date and time and the shipping costs were paid together in one transaction.  He began further investigating parcels sent to the Martins Ferry Address, with a focus on packages coming from zip codes starting with 923 (the area around San Bernardino, California).  He identified approximately 7-8 parcels going to the Martins Ferry Address and pulled images of them.  He determined that all of the parcels had handwritten labels, were paid for in cash, used apparently fake return addresses, and were heavily taped.  Ramos explained that through batch reports, he determined that one of the parcels sent to the Martins Ferry Address was sent at the same time and in the same transaction as a parcel sent to the Delivery Address.  In other words, when paragraph 12 of his affidavit submitted to Magistrate Judge Reinhart stated that "[a]t the

same time that one of these packages was mailed, the same sender also sent a parcel to 149 SE 2nd

Street, Deerfield Beach, FL, 33441[,]" the phrase "one of these packages" was referring to one of

the approximately 12 packages that had been sent to the Martins Ferry Address between January

2021 and July 2021, not the parcel sent to the Martins Ferry Address concomitant with the Elder

Parcel.  However, when confronted with batch reports produced in discovery (in the form of excel

spreadsheets), Ramos could not identify an instance between January 2021 and July 2021 when a

parcel had been sent to the Martins Ferry Address and the Castro Parcel's Delivery Address at the

same time.  Ramos could not explain this discrepancy, suggesting that the spreadsheets produced

in discovery may be incomplete (as data is only available for a limited time) or that the relevant

instance may have occurred before January 2021 (despite what is represented in the affidavit).

     E. <u>Delivery of the Castro Parcel and the Defendant's Arrest</u>[10]

     On September 15, 2021, at approximately 12:04 p.m., an undercover United States Postal

Inspector ("UC") delivered the Castro Parcel to the Delivery Address.  The Defendant took

possession of the Castro Parcel from the UC, and the Defendant entered the warehouse at the

Delivery Address.  Based on video footage, the Defendant went in and out of the Delivery Address.

No one else went in or out.  The beeper that had been inserted into the Castro Parcel did not

activate, thus indicating that the Defendant did not open the Castro Parcel within the warehouse.

     At approximately 12:54 p.m., the Defendant left the Delivery Address with the unopened

Castro Parcel.  After taking a circuitous route, he met co-defendant, Christopher Jones, at

---

[10] With the exception of a few questions by the Defendant to Ramos on cross-examination, neither party elicited facts regarding the delivery of the Castro Parcel and the Defendant's arrest during the May 8 hearing.  The findings herein are based on testimony I received during the Defendant's pre-trial detention hearing, during which the Government proffered the facts in the Criminal Complaint [DE 1] and some additional facts as Ramos's testimony, after which Ramos was subject to cross-examination.  [DE 77-3].  To the extent the Government's Response includes facts regarding the delivery of the Castro Parcel, the Defendant's arrest, and the Defendant's post-arrest statements that are not summarized herein, I have received no testimony or other evidence of those facts, and I do not consider them in making my rulings.

approximately 1:30 p.m. outside a residence in Oakland Park, Florida.  The Castro Parcel was removed from the Defendant's vehicle.  Jones opened the Castro Parcel while standing with the Defendant next to their vehicles and removed several items from the Castro Parcel.  Both men suddenly fled in their separate vehicles.  Items that had been within the Castro Parcel were ultimately recovered from Jones's vehicle, while the parcel's box and the sham substance (with which agent's had replaced the methamphetamine discovered during their search) were found on the route along which Jones had fled.

Law enforcement officers were ultimately able to surround the Defendant's vehicle and arrest him.  During a post-*Miranda* interview, the Defendant indicated that he thought the Castro Parcel had contained marijuana.

F.  <u>Defendant's Testimony Regarding the Delivery Address</u>

The Defendant owned and operated an auto body shop at the Delivery Address in September 2021.[11]  Although he had started the shop in 2003, it had only been at the Delivery Address location for approximately one year.  The location consisted of a row of warehouses with approximately 4 separate bays; the Defendant's bay was bay 1 (consistent with the Delivery Address).  The Defendant leased the bay from an individual named "Joe."  However, around the same time as the delivery of the Castro Parcel, the Defendant was being evicted from the location because his rent payments were a month in arrears.

The Defendant was the only employee of the auto body shop.  There were no other employees in September 2021 or at any other time.  No one named "Castro" ever worked there. The Defendant unequivocally testified that he is not "Castro."

---

[11] Although the Defendant had difficulty remembering whether the address was on NE 2nd Street, SE 2nd Street, or SW 2nd Street, I credit the Defendant's testimony that the Delivery Address was the location he was leasing.

II.   **ANALYSIS**

The Defendant seeks to suppress all evidence stemming from the seizure and search of the Castro Parcel based on three grounds.  First, the Defendant argues that Ramos lacked reasonable suspicion to seize the Castro Parcel by removing it from the mail stream and detaining it pending a dog sniff.  Second, he argues that Wall-E's "alert" to the Castro Parcel did not provide probable cause to search it, claiming that the Government did not sufficiently establish Wall-E's reliability.  Third, the Defendant argues that Inspector Ramos made deliberate (or reckless) false statements in his affidavit in support of the search warrant application presented to Magistrate Judge Reinhart. He asserts that absent these misrepresentations, the search warrant affidavit lacked probable cause. The Government responds that the Defendant lacked a legitimate expectation of privacy in the Castro Parcel, preventing him from challenging its search and seizure.  Alternatively, the Government argues against the merits of each of the Defendant's arguments.  I first consider, as a threshold issue, whether the Defendant has demonstrated a legitimate expectation of privacy. However, even assuming he has shown a legitimate expectation of privacy, I find that all of the Defendant's arguments lack merit.

A.  Defendant's Expectation of Privacy

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The [Fourth] Amendment's protections extend to any thing or place with respect to which a person has a 'reasonable expectation of privacy[.]'"  *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc) (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).  However, "an individual's Fourth Amendment rights are not infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy."  *Id.* (internal citation

omitted).  In other words, "a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search."  *Byrd*, 138 S. Ct. at 1530.  It is a defendant's burden to establish that he had such a reasonable expectation of privacy.  *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000); *United States v. Rose*, 3 F.4th 722, 727 (4th Cir. 2021).  In order to do so, he must (1) "manifest a subjective expectation of privacy in the object of the challenged search" and (2) demonstrate that that expectation is one that society is willing to recognize as legitimate.  *United States v. Smith*, 39 F.3d 1143, 1144 (11th Cir. 1994) (citing *Ciraolo*, 476 U.S. at 211).

"Both senders and recipients of letters and other sealed packages ordinarily have a legitimate expectation of privacy in those items even after they have been placed in the mail." *Rose*, 3 F.4th at 728 (citing *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970)).  "Arguably, a defendant who is neither the sender nor the addressee of a package has no privacy interest in it, and, accordingly, no standing to assert Fourth Amendment objections to its search." *United States v. Pierce*, 959 F.2d 1297, 1303 (5th Cir. 1992) (citing *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988)); *see also Smith*, 39 F.3d at 1145 (identifying fact that defendant was neither the sender nor the addressee of a letter as one of the reasons for finding he had no legitimate expectation of privacy in the letter).  The Eleventh Circuit has held that "[a] defendant may have a reasonable expectation of privacy in a package even where the package is not addressed in the defendant's name, provided he establishes a connection between himself and the addressee." *United States v. Campbell*, 434 F. App'x 805, 809 (11th Cir. 2011) (citing *United States v. Richards*, 638 F.2d 765, 770 (5th Cir. 1981)); *see also Rose*, 3 F.4th at 728 ("When a sealed package is addressed to a party other than the intended recipient, however, the recipient does not have a legitimate expectation of privacy absent other indicia of ownership, possession, or control

existing at the time of the search."). Also, a defendant may be able to claim a legitimate expectation of privacy in a package addressed to an alias. *United States v. Villarreal*, 963 F.2d 770, 774-75 (5th Cir. 1992). However, in such circumstances, the defendant would need to prove that he uses or is connected with that alias. *Rose*, 3 F.4th at 728; *Campbell*, 434 F. App'x at 809.

Whether the Defendant has met his burden of establishing both a subjective expectation of privacy and an objectively reasonable expectation of privacy is highly doubtful. As to the Defendant's subjective expectation of privacy, it is unclear on what facts the Defendant does, or even plausibly can, rely. The Defendant's testimony did not discuss the Castro Parcel itself, the Defendant's knowledge about or actions regarding that parcel, or what expectations of privacy he had (if any) in the contents of that parcel. All the Defendant's testimony established is that he had an auto body shop at the Delivery Address but that the Defendant is not "Castro" (and that no person named "Castro" is or ever was associated with the business). Rather, the only facts in the record that might bear on the Defendant's subjective expectations are that: (1) he received the Castro Parcel; (2) within less than an hour he brought it to someone else (Jones); (3) Jones opened the parcel; (4) Jones took the parcel as both he and the Defendant fled; and (5) the Defendant later told law enforcement that he thought the parcel had contained marijuana (when it actually had contained methamphetamine). These facts do not satisfy the Defendant's burden of manifesting a subjective expectation of privacy. Indeed, the fact that he affirmatively testified that he is not the person to whom it was addressed, was unaware of its true contents, brought it to someone else shortly after he received it, and *that* person opened (and retained) it all suggest the Defendant did not have a subjective expectation of privacy in the parcel.

Assuming the Defendant did manifest a subjective expectation of privacy, it is also questionable whether society would recognize that expectation as objectively reasonable. This

question largely comes down to whether the Defendant can be considered the "addressee" for the Castro Parcel.   As described above, the "addressee" ordinarily has a reasonable expectation of privacy in a letter or package, whereas one who is not the sender or addressee ordinarily does not, absent a showing that he is connected to the addressee or uses the addressee name as an alias.[12] On one hand, the Castro Parcel was addressed to "Auto Body Shop" at the physical address that the Defendant indeed leases for an auto body shop.   Were this the only appellation on the package, then the Defendant would clearly be considered the "addressee" as the owner (and only employee) of the business and the lessee of the property.   However, "Auto Body Shop" was not the only name on the parcel; rather, the parcel appeared to be directed at a specific person at that location, "Castro."[13]   Based on the Defendant's testimony, he is not "Castro" and has no employees named "Castro."

The Eleventh Circuit's decision in *Campbell* suggests that these facts are insufficient for the Defendant to meet his burden of establishing a legitimate expectation of privacy.   In *Campbell*, two brothers (Alex and Fredrick Campbell) sought to challenge the search of a parcel addressed to another individual at an address on Praver Drive.   434 F. App'x 805; *Campbell v. United States*, 743 F. App'x 412, 413 (11th Cir. 2018) (specifying that the parcel was addressed to "Maureen Lawrence").   As here, the parcel was searched prior to a controlled delivery to the delivery address. 434 F. App'x at 808-09.   Alex Campbell was the lessee of the Praver Drive address, and the parcel was ultimately found in his car (following the controlled delivery).   *Id*. at 809.   However, the

---

[12] While the Defendant also possessed the parcel, albeit for less than 90 minutes, the Court must still examine whether the Defendant was the addressee.   "Although possession or ownership is one factor courts may consider when determining whether a defendant has a legitimate expectation of privacy in an object, it 'is not a proxy for determining whether the owner had a Fourth amendment interest, for it does not invariably represent the protected Fourth Amendment interest.'" *Campbell*, 434 F. App'x at 809 (quoting *United States v. Salvucci*, 448 U.S. 83, 91 (1980)).

[13] At the hearing, the Defendant argued that USPS did not require the parcel to be addressed to a specific individual and that addressing it to "Auto Body Shop" would have been sufficient.   However, regardless of whether that is true, the facts here are that the parcel was directed at a more specific individual.

Eleventh Circuit found that Alex Campbell's control over the delivery address property (as the lessee) and his possession of the parcel were insufficient to establish a Fourth Amendment interest in the parcel where he established no connection to the named addressee nor that he used that name as an alias. *Id*. The court similarly found that Fredrick Campbell had no Fourth Amendment interest, despite accepting delivery of the parcel from the undercover officer, given his lack of connection to the named addressee and his later attempts to distance himself from the parcel when questioned by police. *Id*.

Although the Defendant's situation here is an amalgam of the two different brothers in *Campbell* (having both Alex's lessee status and possession of the parcel, as well as Fredrick's acceptance of the delivery), the Eleventh Circuit's reasoning suggests that the Defendant has not established a legitimate expectation of privacy here. Like Alex Campbell, the Defendant was the lessee of the Delivery Address but not the named individual on the parcel. But the Eleventh Circuit found that was not enough (even in combination with possession of the parcel) in the absence of establishing a connection to that named individual or that the name was his alias. Accordingly, I find that the Defendant has likely failed to establish a legitimate expectation of privacy necessary to challenge the search of the Castro Parcel. However, even assuming the Defendant is considered the "addressee" and had a legitimate expectation of privacy, his motion nevertheless fails for the reasons stated below.

### B.  Reasonable Suspicion for Initial Seizure

Ramos had reasonable suspicion sufficient to temporarily detain the Castro Parcel pending the drug detection canine inspection. An officer may, consistent with the Fourth Amendment, temporarily detain a postal package based on reasonable suspicion until it can be inspected by a drug detection dog. *United States v. Banks*, 3 F.3d 399, 403 (11th Cir. 1993). Reasonable

suspicion requires more than just a "hunch of criminal activity," *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003), but less than a standard of probable cause. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). In determining whether reasonable suspicion exists, courts "look at the 'totality of circumstances' of each case to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citations omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (internal citations omitted).

Here, Ramos credibly explained a number of specific and articulable circumstances that gave him a particularized and objective basis to suspect that the Castro Parcel was involved in illegal activity.[14] While Ramos cited a number of facts that aroused his suspicion, by far the most significant were the facts regarding the Return Address and Delivery Address. As discussed above, Ramos's check of open-source databases and Google or Apple Maps strongly indicated that the Return Address simply did not exist. The fact that the address could not be located or associated with any individual (much less the individual listed as the sender), combined with the facts that it misspelled the (fake) address, gave the wrong zip code for the city listed, and listed a zip code 100 miles away from where the parcel was actually mailed all objectively give reason to believe the sender did not want to be identified or associated with the parcel. Similarly, Ramos had specific and articulable reasons to believe that the recipient was trying to avoid detection based

---

[14] This is so even setting aside any perceived connections between the Castro Parcel and the Elder Parcel.

on the fact that Ramos could not locate anyone named "Castro" associated with the Delivery Address (based on open-source databases) nor anyone with that name who reportedly earned wages at that address (based on state wage reporting records). Although there are many legitimate reasons why senders or recipients of packages may wish to remain anonymous, it is also reasonable for a law enforcement officer to view such facts with suspicion that warrants further investigation. Indeed, in an analogous situation, the Eleventh Circuit has said, "the postal inspector was correctly suspicious of the fact that both the listed sender and receiver were not associated with the addresses on the package." *United States v. Bright*, 709 F. App'x 576, 578 (11th Cir. 2017) (citing *Van Leeuwen*, 397 U.S. at 252).

As in *Bright*, while the lack of association of sender and recipient with their respective addresses "may not have been enough on its own," a number of other specific facts reasonably supported Ramos's suspicion. *See id.* For example, Ramos cited the fact that the Castro Parcel had handwritten labels, did not use a business account, was paid for in cash, was heavily taped, and was coming from a "known source state," California. Each of these facts, taken individually, may be innocuous. As the Defendant argues, there are no requirements for overnight packages to have printed labels or to use a business account with a credit card, and thousands (perhaps millions) of innocent packages are mailed from California (the most populous state in the country) every day. But assessing reasonable suspicion requires viewing the totality of circumstances as a whole, rather than viewing each fact in isolation. *Arvizu*, 534 U.S. at 273; *see also United States v. Suarez*, 21-20290-CR-Scola, 2021 WL 3667011, *4 (S.D. Fla. Aug. 18, 2021). Moreover, the facts constituting reasonable suspicion need not prove guilt, or even establish probable cause. They merely need to provide an articulable basis for an objective reason to be suspicious of wrongdoing to warrant further investigation. Taken together, particularly in conjunction with Ramos's training

and experience, the handwritten labels, cash payment, heavy taping, and source location (along with the fictitious sender and recipient) were all consistent with methods used by those attempting to hide their activities, and particularly those who send drugs through the mail. Indeed, *Bright* cited many of the same facts as supporting reasonable suspicion. *See* 709 F. App'x at 578 (identifying, *inter alia*, "handwritten labels on a business package, very heavy taping, [and] an origin city that is a known narcotics source" as specific facts causing reasonable suspicion). Consequently, Ramos had reasonable suspicion to detain the parcel for further investigation.

Moreover, the length of such detention was reasonable. The Eleventh Circuit has held that law enforcement officers are not required to maintain drug detection canines at the site of probable criminal activity; rather, reasonable suspicion allows for a reasonable detention to obtain such a canine to conduct an inspection. *Banks*, 3 F.3d at 402 (citing *United States v. Cooper*, 873 F.2d 269, 275-76 (11th Cir. 1989)). Here, Ramos first pulled the Castro Parcel out of the mail stream sometime on September 9. He called Deputy Tejada that same day, and Deputy Tejada and Wall-E arrived within 30 minutes of that call to conduct the inspection. Therefore, the pre-canine-inspection seizure of the Castro parcel clearly lasted less than one day and likely only for a few hours. By any measure, this was a reasonable amount of time. *See id.* (finding reasonable delay when seizure and canine inspection occurred on the same day).

C.  Probable Cause

Wall-E's alert established probable cause to obtain a search warrant and search the Castro Parcel. Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, — U.S. — , 138 S. Ct. 577, 586 (2018) (internal citation omitted); *United States v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020). It is not a "high bar." *Wesby*, 138 S. Ct. at 586; *Delgado*, 981 F.3d at 897. "A drug

detection dog's alert can provide probable cause to conduct a search." *United States v. Braddy*, 11 F.4th 1298, 1332 (11th Cir. 2021) (citing *Florida v. Harris*, 568 U.S. 237, 246-48 (2013) and *Banks*, 3 F.3d at 402). "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris*, 568 U.S. at 246. "A defendant, however, can challenge such evidence by 'cross-examining the testifying officer or by introducing his own fact or expert witness[]' to contest the adequacy of a certification or a training program or how the dog or handler performed in that program." *Braddy*, 11 F.4th at 1312 (quoting *Harris*, 568 U.S. at 247). Nevertheless, there is no "strict evidentiary checklist" to assess a drug-detection dog's reliability. *Harris*, 568 U.S. at 244-45.

Here, the Government sufficiently established Wall-E's reliability such that his alert on the Castro Parcel amounted to probable cause. As Deputy Tejada testified, both he and Wall-E have been trained through a bona fide training program and certified by a bona fide organization (FLECA). The initial training took six months and involved 420 hours of training, and Wall-E passed his certification examination on the first try. Wall-E has since undergone near-weekly training sessions and has been re-certified three more times (including in the year during which the subject inspection occurred) without ever failing a certification test. Notably, the training courses have focused on training Wall-E to detect odor of narcotics and have specifically trained against alerts for other odors by incorporating "distractors" into the training. As Deputy Tejada testified, not alerting on the "distractors" is part of the certification examination that Wall-E has consistently passed.

In order to impeach Wall-E's reliability, the Defendant focused on Wall-E's performance in the field, specifically how often he has alerted on a place or object where no drugs are subsequently found. As discussed above, Deputy Tejada testified that he could only recall two

such instances (one in 2023 and one in 2022), out of more than 100 searches in more than three years.[15] But the Defendant points to Deputy Tejada's unwillingness to label such instances as errors – or even acknowledge that they *could be* errors – to suggest that PBSO has set up a system where a drug detection canine's error rates are not tracked and any potential false-positive alerts can be ignored. He further argues (or at least implies) that Deputy Tejada's testimony that Wall-E has "never" been wrong, even when starting training as a puppy, is not credible and indicative of a system that cannot accurately state a detection canine's error rate (even if it is not intentionally attempting to obscure that error rate). The fact that, according to Deputy Tejada, none of the 20-25 PBSO drug detection canines have alerted incorrectly or been decommissioned for poor performance could similarly either point to extraordinary training or an insensitivity to potential errors.

I agree that Deputy Tejada's unwillingness to even consider that an alert that does not lead to the discovery of narcotics could be an error is troubling. While it is a distinct and reasonable possibility that such alerts are accurate reactions to residual odor from drugs that were (but are no longer) present or are too well hidden to find, one must acknowledge that it is at least possible for even well-trained dogs to make mistakes. An unwillingness to at least consider the possibility does potentially point to a dangerous "head-I-win-tails-you-lose" mindset wherein a detection canine's performance can never be questioned. The suggestion that Wall-E has never alerted on anything other than a controlled substance – even in his earliest training days when he was first trying to figure out which alerts would yield rewards and which ones would not – is also implausible. However, I do not find that Deputy Tejada's factual testimony is incredible, particularly on the most salient points that establish Wall-E's reliability.

---

[15] The search of the Elder Parcel arguably constitutes a third instance, since the controlled substance actually found – fentanyl – is not one that Wall-E has been trained to detect.

For one, Deputy Tejada did testify that he documents when Wall-E alerts but no drugs are found by filing a "negative" report; so such instances are tracked, even if the handler does not believe the dog made an error.  Moreover, he testified that he and PBSO take steps to correct such instances by not rewarding the dog and by continuing with training.  Furthermore, even in the event Deputy Tejada's recounting of the number of times Wall-E has alerted without drugs being found – twice in over 100 searches (less than 2%) over three years – was understated,[16] in order to conclude that Wall-E is unreliable to the point that his alert does not amount to probable cause, his "error rate" would need to be exponentially higher.  That is because the standard of "probable cause" only requires a fair probability that evidence of a crime is present.  A trained detection canine whose alerts lead to the discovery of drugs even, say, only 70% of the time would easily pass this standard.

But, ultimately, it is the evidence of Wall-E's training, and his certification from that training, that carries the day.  As discussed above, based on Deputy Tejada's credible testimony, that training accounts for, and minimizes, the possibility of false positive alerts through its use of distractors and tests designed to confirm that the dog will not alert when he should not in addition to seeing if he does alert when he should.  That evidence is more indicative of Wall-E's reliability than attempts to measure his performance in the field, as the Supreme Court has discussed in addressing the same arguments presented here:

> [I]f the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where

---

[16] To be clear, having observed his testimony, I do not find that Deputy Tejada was intentionally dishonest.

a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

For that reason, evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

*Harris*, 568 U.S. at 245-47.

The same reasoning applies here, with PBSO having the same incentives to avoid using dogs that routinely alert in the absence of drugs. Regardless of the qualms about Deputy Tejada's assessment of Wall-E's capacity for error, no evidence undermined the reliability of the training Wall-E has completed nor the certifications he has earned following that training. Nor was any evidence presented that would suggest error in Deputy Tejada's handling of Wall-E here. Therefore, I find that the Government established Wall-E's reliability and that Wall-E's alert on the Castro Parcel established probable cause to seize and search it.

To the extent the Defendant argues that the continued seizure of the Castro Parcel between Wall-E's inspection on September 9 and execution of the search warrant on September 13 requires suppression (*see* DE 77 at 9), the Defendant's argument fails. As discussed above, reasonable suspicion justified the brief detention of the Castro Parcel while Ramos sought a canine inspection. However, once Wall-E alerted on the Castro Parcel, Ramos had probable cause to seize it, and such seizure (even without a warrant) was reasonable, at least temporarily. *See United States v. Jacobson*, 466 U.S. 109, 121-22 (1984). Such a seizure based on probable cause, even if lawful at its inception, can become unreasonable if law enforcement acts with "unreasonable delay in

securing a warrant." *United States v. Mitchell*, 565 F.3d 1347, 1350-51 (11th Cir. 2009).   But the facts and circumstances here indicate no such "unreasonable delay."   *See id*. at 1351 ("The reasonableness of the delay is determined 'in light of all the facts and circumstances,' and 'on a case-by-case basis.'").   Ramos submitted his application for a search warrant the next day (a Friday).   Although Magistrate Judge Reinhart did not issue the warrant until the following Monday, there is no indication that the delay from Friday to Monday (the next business day) was due to any lack of diligence on Ramos's (or any other Government agent's) part.   Moreover, once Magistrate Judge Reinhart approved the warrant on Monday, September 13, Ramos executed it immediately.   Under these circumstances, the delay between the initial seizure of the Castro Parcel and the execution of the search warrant was not unreasonable.   *See Suarez*, 2021WL3667011 at *7 (five-day delay between initial detention of parcel and execution of search warrant – with an intervening weekend – was reasonable) (citing *United States v. Gasner*, 315 F.3d 839, 842-44 (7th Cir. 2003)); *United States v. Garcia-Geigel*, 6:17-cr-160-Orl-31KRS, 2018WL309935, *1 (M.D. Fla. Jan. 5, 2018) (ten-day delay between canine alert on parcel and issuance of search warrant was not unreasonable).

D.  Request for *Franks* Hearing

Finally, the Defendant argues, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), that Ramos deliberately or recklessly made false statements in the search warrant affidavit presented to Magistrate Judge Reinhart and that these false statements were essential to the finding of probable cause.   Specifically, the Defendant argues that assertions suggesting that the "same sender" sent the Elder Parcel and the Castro Parcel were misleading and essential to finding probable cause.

Under *Franks*, a defendant is entitled to an evidentiary hearing if he (1) makes a substantial preliminary showing that statements or omissions made in an affidavit supporting a search warrant are deliberately false or made with reckless disregard for the truth, and (2) the allegedly false statement is necessary to the finding of probable cause. 438 U.S. at 155-56. If, at such a hearing, a defendant is able to demonstrate (by a preponderance of evidence) that the affiant made deliberately or recklessly false statements that (when those statements are set aside) leave the affidavit without sufficient evidence to establish probable cause, then the warrant is voided and the fruits of the search excluded. *Id*. at 156. However, if the search warrant "would be supported by probable cause even after setting aside the alleged misrepresentations or considering the information allegedly omitted, no hearing is required." *United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021).

Here, the Defendant's argument fails because, setting aside the alleged misrepresentations or omitted information, the affidavit still establishes probable cause for the issued search warrant. Specifically, even if one were to delete paragraphs 9-12 and 15 of the affidavit presented to Magistrate Judge Reinhart (discussing the search and seizure of the Elder Parcel and the asserted connections between the Elder Parcel, parcels sent to the Martins Ferry Address, and the Castro Parcel's Delivery Address), the affidavit still establishes probable cause. Removing these paragraphs, the affidavit [DE 77-1] avers that: (1) the Return Address is not associated with a physical structure (¶ 13(b)); (2) no individual named "Castro" is associated with the Delivery Address (¶ 13(c)); (3) California is a "known source state for controlled substances" (¶ 14); (4) the Castro Parcel was not shipped using a business account or typewritten labels often used for Priority Mail Express services (¶¶ 6-7, 13(a), Attachment A); (5) in Ramos's training and experience, drug traffickers frequently use Priority Mail services and, when doing so, commonly use fictious names

and addresses for the sender and recipient (¶¶ 7, 16); and, most importantly, (6) a trained and certified narcotics-detection canine alerted to the parcel, after inspecting it in an open-air setting among similar sized parcels (¶¶ 18-19).

As discussed above, "[a] drug detection dog's alert can provide probable cause to conduct a search." *Braddy*, 11 F.4th at 1332. Here, the averments as to Wall-E's inspection and his training and certification[17] were enough to establish Wall-E's alert and that his alert was sufficiently reliable to amount to probable cause. *See United States v. Ligon*, 861 F. App'x 612, 620-21 (6th Cir. 2021) (affidavit sufficiently established dog's reliability by identifying its certification by a bona fide organization and citing 80 hours in a state-certified training program). It therefore stands to reason that Wall-E's alert, combined with the other assertions regarding the sending and receiving addresses, the lack of printed labels and a business account, and the ways that these factors match typical practices of individuals sending drugs through Priority Mail services, amounted to probable cause. So, even if the Court were to find that Ramos's representations regarding the senders of the Elder Parcel and Castro Parcel were deliberately false or made with reckless disregard for the truth – an issue that I do not reach – the Defendant's argument would fail because such representations were not necessary to finding probable cause.

---

[17] The hearing testimony revealed an error in the affidavit's representations about Deputy Tejada's and Wall-E's experience together that was not identified in the Defendant's Motion nor cited as the basis for a *Franks* hearing. The affidavit represented that "PBSO Deputy Cesar Tejada and Wall-E have trained and worked as a team for approximately three years." [DE 77-1 at ¶ 19]. However, Deputy Tejada's testimony made clear that he and Wall-E began training and working together in early 2020. So, in September 2021, he and Wall-E had only been training and working together as a team for somewhere between one and two years. Nevertheless, even had the affidavit indicated that Deputy Tejada and Wall-E had only worked together for between one to two years, its representations about their completion of 420 hours of Narcotics Detection Courses, certification for detection of methamphetamine, and yearly re-certification would have been sufficient to establish Wall-E's reliability. And, in any event, as detailed above, I have found Wall-E to be reliable after hearing testimony and providing the Defendant with an opportunity to challenge Wall-E's reliability. In short, the discrepancy regarding Deputy Tejada and Wall-E's experience does not undermine the conclusion that the affidavit established probable cause.

The Defendant argues that Ramos's suggestion in the affidavit that the "same sender" sent the Elder Parcel (found to contain fentanyl) and the Castro Parcel was "the most compelling . . . reason he gave for opening the parcel" and "the type of statement that any judge would pay attention to."  Motion at 20-21; *see also* [DE 89 at 239:15-25] (describing the asserted connection as "powerful").  However, this argument is unavailing for two reasons.  First, whether the suggestion of a "direct link" (as the Defendant elsewhere describes it) between the Elder Parcel and Castro Parcel is compelling or powerful or would significantly contribute to a finding of probable cause is not the standard.  The question is whether the other assertions in the affidavit amount to probable cause after removing the alleged misrepresentations (and I have found that they do).  Second, the Defendant overstates how compelling the represented connection between the Elder Parcel and the Castro Parcel is.  The representations in the affidavit are that: (1) the sender of the Elder Parcel (which was found to contain fentanyl) at the same time sent a parcel to the Martins Ferry Address (with no further information about what that parcel contained); (2) twelve other parcels had been sent to the Martins Ferry Address over the previous seven months, which "appear suspicious" (but, again, without any indication of what they actually contained); and (3) at the same time that "one of these packages" (i.e. one of the twelve previously sent to the Martins Ferry Address) was sent, the "same sender" also sent a parcel to the Delivery Address.  Although I agree that the purpose of these representations was to insinuate that whomever sent fentanyl in the Elder Parcel also sent the Castro Parcel, they do not amount to the "compelling" "direct link" that the Defendant describes them as.  Rather, the representations present a convoluted picture relying on four different parcels (only one of which was ever shown to actually contain drugs) sent to three different addresses.  In other words, whatever the intention of the challenged representations was, they only marginally contributed to finding probable cause.  Rather, the most

compelling and essential fact for finding probable cause was Wall-E's alert (combined with the other details about the Castro Parcel itself, described above).

### III.   <u>CONCLUSION</u>

For the foregoing reasons, I respectfully RECOMMEND that the Defendant's Motion to Suppress [DE 77] be **DENIED** and that the Government's Motion to Dismiss the Defendant's Motion to Suppress [DE 81] be **DENIED AS MOOT**.

The parties will have fourteen days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary, in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 18th day of May, 2023.

JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE